AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California



**FILED**

**Nov 04, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of | ) |
| --- | --- |
|  | ) |
| The person of Michael Chand and any cellular | ) |
| or electronic devices found on his person | ) |
|  | ) |
|  | ) |

Case No.   2:20-sw-1021 KJN

# SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 2261A | Stalking |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Christie Hirota
_____
*Applicant's signature*

Christie Hirota, TFO SSO
_____
*Printed name and title*

Sworn to before me and signed telephonically.

Date: ___11/04/2020___

City and state: ___Sacramento, California___

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

1  MᴄGREGOR W. SCOTT
   United States Attorney
2  AMY S. HITCHCOCK
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone:  (916) 554-2700
   Facsimile:   (916) 554-2900

5

6  Attorneys for Plaintiff
   United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  In the Matter of the Search of:          CASE NO.

12  The room controlled by Michael Chand at   AFFIDAVIT IN SUPPORT OF AN APPLICATION
    10086 Mills Station Road, Sacramento, CA   UNDER RULE 41 FOR A WARRANT TO
13  95827 and any cellular or electronic devices   SEARCH AND SEIZE
    found therein; and
14

15  The person of Michael Chand and any cellular
    or electronic devices found on his person
16

17

18          I, Christie Hirota, being first duly sworn, hereby depose and state as follows:

19                    **I.        INTRODUCTION AND AGENT BACKGROUND**

20          1.        I make this affidavit in support of an application under Rule 41 of the Federal Rules of

21  Criminal Procedure for a warrant to search the The person of Michael Chand and any cellular or

22  electronic devices found on his person, hereinafter the "PREMISES," as further described in Attachment

23  A-1, and a warrant to search the person of Michael CHAND, as further described in Attachment A-2, for

24  the things described in Attachment B.

25          2.        I am a Detective with the Sacramento Sheriff's Office (SSO), and have been since

26  January 2002.  Since February 2013, I have been assigned to the Sacramento Valley Hi-Tech Crimes

27  Task Force (SVHTCTF), Internet Crimes Against Children (ICAC).  Since September 2013, I have been

28  assigned to the Federal Bureau of Investigations (FBI) Sacramento Violent Crimes Against Children

(VCAC) Task Force as a Task Force Officer (TFO).  As such, I am duly sworn as a Special Deputy U.S. Marshal of the United States Department of Justice.  As part of my daily duties as a Detective and TFO, I investigate criminal violations relating to child exploitation, child pornography, cyberstalking, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography.  I am authorized to investigate crimes involving the sexual exploitation of children, cyberstalking, and sextortion via the internet.  I have been the affiant on multiple search warrants involving child exploitation matters, which led to the arrest of individuals and the seizure of illicit evidence within the Eastern District of California and have participated in the execution of over 250 search warrants and seized evidence of violations of 18 U.S.C. § 2252, among other federal crimes.

3. I have attended numerous courses in the investigation of hi tech crimes, cyberstalking, sextortion, child sexual exploitation, child pornography, and online child sexual exploitation.  In the course of my duties I have been the investigating officer and Affiant of over 400 applications for search warrants relating to child pornography investigations.  I have a Bachelor of Science Degree in Criminal Justice from the California State University at Sacramento as well as an Associate of Arts Degree from the College of Marin.  I have attended several Peace Officer Standards and Training certified courses sponsored by the Sacramento County Sheriff's Department, the State of California Department of Justice, and the Federal Bureau of Investigations that include, but are not limited to The Robert Presley Institute of Criminal Investigations, Sexual Assault Investigations, Computer Data Recovery, Child Sexual Exploitation Investigations, Protecting Victims of Child Prostitution, Internet Crimes Against Children Investigative Techniques, Computer Crime/Internet Investigations,  Interview and Investigation techniques, and Narcotics Tactical Entry course.

4. While working at the SVHTCTF, I have received no less than 50 training courses specifically involving the detection and investigation of criminal activity involving High Tech Crimes. I have attended the Crimes Against Children Conference in Dallas, Texas and the National Law Enforcement Training and Exploitation in Atlanta Georgia numerous years. I have observed no less than 95 ICAC and computer crimes related webinars. The following is a sample of some of training; I have also completed the following High Technology/Computer Forensic Schools from the California Department of Justice:  Basic Computers (40 hours), Computer Data Evidence and Recovery (CDER)

(80 hours), Computer Crimes-Pre-Search (36 hours), and Internet Investigations (40 hours). I have also completed the following High Technology / Computer Forensic Schools from the ICAC Training & Technical Assistance Program: ICAC Undercover Investigations Training Program (40 hours), ICAC On-Scene Investigations (24 hours), and ICAC Investigative Techniques (40 hours) and ICAC Undercover Concepts and Techniques (76 hours). In addition, I completed the Core Skills for the Investigations of Mobile Devices (24 hours), through SEARCH all of which encompasses over 350 hours of training.  I have received my P.O.S.T specialty certificate for Computer Crimes Investigation from the Robert Presley Institute of Criminal Investigation in November 2014.

5.     I also provide instruction to both law enforcement and civilians in the area of Internet security, online child exploitation, as well as social networking sites. I have received training in the areas of computers and computer forensics and I also have a certificate from the Robert Presley Institute of Criminal Investigation. I have gained expertise in the conduct of such investigations through training in the form of seminars, classes, and on the job experience. I have observed and been involved in investigating crimes such as cyber stalking in all forms, ICAC crimes including via computer media. During my assignment with the SVHTCTF and FBI TF, I have participated in the execution of no less than 330 search and seizure warrants related to involving numerous different violations of federal law.

6.     As set forth below, I believe there is probable cause to believe that Michael CHAND has committed, and is committing, the crime of stalking, in violation of 18 U.S.C. § 2261A.  Furthermore, I believe there is probable cause to believe that evidence, fruits, or contraband of this crime can be found on CHAND's person, in the room he controls at the PREMISES, and/or on his cellular device(s) or other electronic device(s) used by CHAND and in his control.

7.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## II.     PROBABLE CAUSE

8.     On October 8, 2020, the Federal Bureau of Investigation (FBI) Operations center received a complaint from an adult female, CW,[1] a resident of Arlee, Montana.  CW reported that she

---

[1] CW's full name is known to the affiant but is abbreviated here to protect her identity.

1  was being harassed by Michael CHAND, who used the telephone and social media to repeatedly contact

2  and threaten her.  CW reported that CHAND used the phone number **916-585-2918** and resided in

3  Sacramento, CA.  She further stated that CHAND was also creating numerous social media accounts to

4  contact her, despite her efforts to block him.  CW stated that CHAND had nude photographs of her from

5  when she was under the age of 18, and that CHAND was threatening to send the photographs to her

6  friends and family if she did not reciprocate contact.

7       9.    CW was previously the victim of CHAND's extortion and distribution of child

8  pornography.  On November 18, 2016, CHAND pleaded guilty in the Superior Court of California,

9  County of Sacramento for violations of California Penal Code 311(A)—Distribution of Child

10  Pornography, California Penal Code 288.3(A)—Contact with a Minor to Commit a Felony, and

11  California Penal Code 520—Extortion in relation to his conduct involving CW.  *See* California Superior

12  Court Case No. 16FE011584.  I am familiar with this case and worked on the criminal investigation

13  leading to the charges.  I am aware that when CW was 14 years old, she met CHAND online.  CHAND

14  solicited sexually explicit photographs from CW, and then extorted the production of additional

15  photographs by threatening to distribute the photographs to CW's friends and family.  I am aware that

16  CHAND did in fact send sexually explicit and nude photographs of CW to her friends and family, as

17  threatened.  CHAND ultimately was charged for and pleaded guilty to this conduct.

18       10.    On January 1, 2017, CHAND was sentenced by the Superior Court of California to two

19  years in prison for his offense conduct involving CW.  The terms of his parole, which I have reviewed,

20  included a prohibition against contacting CW, the victim of his crimes.

21       11.    In her report to the FBI, CW stated that CHAND contacted her in January 2020 to

22  purportedly attempt to make amends for his past behavior.  When CW endeavored to block CHAND's

23  contact, she stated that CHAND changed his phone number and social media accounts in an attempt to

24  contact her.  I have spoken with the last Parole Officer who supervised CHAND after his release from

25  state prison, Bridget Bell, and she confirmed that CW contacted her to complain of repeated and

26  harassing contact by CHAND.  The parole officer stated that when she checked CHAND's phone, he

27  had deleted content, and thus she could not confirm CW's complaints.  She stated that she warned

28  CHAND not to contact CW.

12.   CW reported that in approximately September 2020, CHAND's repeated contacts became threatening.  A review of CW's phone showed that she received approximately 44 voicemails since September 2020 from blocked numbers, whom she believed to be CHAND.  CW stated that the voice in the voicemails was CHAND.  I have listened to a selection of these voicemails.  I have also spoken to CHAND in person in the past, and believe that the voice in the voicemails is consistent with CHAND's voice.  The following are approximate transcripts of a selection of the voicemails left on CW's phone, which were reviewed either by myself or an FBI agent:

a)   On October 2, 2020 at 3:42 AM, from a blocked number: "Yeah that's what I fucking thought nigga, turn off your phone like a fucking bitch coward. That's okay I know where your fucking family lives, I know where your fucking daughter lives. I will fucking visit that place.  Cus guess what, nothing is stopping me, I can, because you're registered in Montana or in freaking Idaho, I don't fucking give a shit. You want to come at me? Fuck that nigga, see what happens."

b)   On October 8, 2020 at 5:39 PM, from a blocked number: "We can do this over the phone, or we can wait till July [unintelligible] because I have the text messages that say I'll get my money back if I want my money back. Bitch I want my money back. I have a bunch of witnesses, we can do this here, over the phone or we can do this on the front lawn with me breaking down the damn fucking door."

c)   On October 9, 2020 at 5:30 PM, from a blocked number: "Then again I can find your aunt's Facebook, Kate's Facebook, your real Facebook…. I can send them everything [CW], I really have nothing to lose at this point."

d)   On October 11, 2020 at 1:05 PM: "Damn, this message is about [unintelligible] because I want to tell you what the fuck I did. See, I know you're spiritual and religious and all that shit. [unintelligible] Rachel is full pagan, so what we did is we found a witch, and thanks to the picture you sent us of your son, and your son's name, we decided to pay somebody to curse your son. So every time he gets sick, is it because of nature or is it because of the curse. Hmmm, ahhh, [unintelligible]  I have had it with you. I have had it with you thinking I am a threat to your son, I have had it with you calling me a sexual predator,

1    pedophile, etc etc…Yes Tony keeps me informed but I don't give a shit, I am not

2    stopping him from doing anything. Soooo, merry fucking Christmas."

3    13.    CW reported that she suffers from Post-Traumatic Stress Disorder (PTSD), anxiety and

4 depression related to CHAND's previous harassment and extortion.  CW reported that, since CHAND

5 has begun to harass her again, she has been suffering the effects of her PTSD.  CW said she has been in

6 constant fear of violence inflicted to her and to her family.  CW stated she has had severe emotional

7 distress due to the harassment.

8    14.    The FBI has received and reviewed Metro PCS records for the telephone number **916-**

9 **585-2918** (hereinafter, **the Telephone Number**), which, as set forth below, I have probable cause to

10 believe is being used by CHAND.  According to Metro PCS records, the Telephone Number is

11 subscribed to by Michael Jamison, at an address in Sacramento.[2]  I know from my work on CHAND's

12 previous criminal case, and from reviewing public records related to that case, that Jamison is

13 CHAND's middle name.

14    15.    Review of Metro PCS records show that, from June 3, 2020 to October 16, 2020, the

15 Telephone Number contacted CW's previous and current telephone numbers 176 times.  Notably, the

16 call dates and times match the voicemails CW provided to the FBI, and excerpted above.  Furthermore,

17 the records show that the user used *67 to block the outgoing phone number, so that when CW's phone

18 received the calls, the number was blocked to the recipient.

19    16.    On October 16, 2020, the FBI served a preservation letter to Metro PCS, requesting that

20 they preserve all account information from January 1, 2020 to October 16, 2020.  The physical device(s)

21 used by CHAND are important to the investigation, however, as devices such as cellular and wireless

22 phone hold historical communication data, specific social network application data that may have been

23 used to communicate with the victim, and other relevant data including that which relates to the

24 identification of the user of the device.  It is an item used to commit or facilitate the commission of the

25 offense.

26    17.    In September 2020, CHAND lodged a complaint with the Sacramento County Sheriff's

27

28    [2] This address is one associated with CHAND in the past, but different than the PREMISES.  For the reasons set forth herein, I believe CHAND is currently residing at the PREMISES.

1  Office because he claimed that an ex-friend threatened to post his sex offender status online.  For this

2  call for service, CHAND called from the Telephone Number and had Deputies dispatched to the

3  PREMISES to take the report.

4      18.      On October 16, 2020, I called and reached CHAND at the Telephone Number.  During

5  my conversation with CHAND, he confirmed that he used the Telephone Number.

6      19.      During this conversation, CHAND provided me with a Facebook account he was using at

7  the time he claimed he was being harassed by his ex-friend.  The name on this account was "Michael

8  Beach" and the profile image appeared to be CHAND.  I reviewed the public page, and noticed screen

9  captures of CW and another male posted on CHAND's Facebook wall.  Under the pictures of CW,

10  CHAND wrote: "Her name is actually [CW], born in Rona, Montana. She killed her ex [MF]. Now shes

11  with a rapist name [RK]. She is planning on moving into a "small house" with him a baby and two dogs.

12  Please help me find a way to get the poor kid away from her. I'm afraid when the kidd old enough mr. K

13  will rape her. I know for a fact that he already has been raping CW but she refuses to leave him. Thank

14  you all."

15      20.      Also during my conversation with CHAND, he stated that he lived at the PREMISES.  I

16  contacted CHAND's last Parole Officer, Officer Bell, who stated that she made compliance visits to

17  CHAND at the PREMISES.  Officer Bell described the location of the room at the PREMISES in which

18  CHAND resides, as further described in Attachment A-2.

19              **III.**      **TECHNICAL TERMS**

20      21.      Based on my training and experience, I use the following technical terms to convey the

21  following meanings:

22      a)      Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is

23              a handheld wireless device used for voice and data communication through radio signals.

24              These telephones send signals through networks of transmitter/receivers, enabling

25              communication with other wireless telephones or traditional "land line" telephones.  A

26              wireless telephone usually contains a "call log," which records the telephone number,

27              date, and time of calls made to and from the phone.  In addition to enabling voice

28              communications, wireless telephones offer a broad range of capabilities.  These

capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. I believe these statements to be true about such device(s) seized from CHAND, his body or his residence.

b)   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c)   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system

1      ("GPS") technology for determining the location of the device.

2      d)      Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a

3              notebook, that is primarily operated by touching the screen.  Tablets function as wireless

4              communication devices and can be used to access the Internet through cellular networks,

5              802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps,

6              which, like programs on a personal computer, perform different functions and save data

7              associated with those functions.  Apps can, for example, permit accessing the Web,

8              sending and receiving e-mail, and participating in Internet social networks.

9      e)      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric

10             address used by computers on the Internet.  An IP address is a series of four numbers,

11             each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer

12             attached to the Internet computer must be assigned an IP address so that Internet traffic

13             sent from and directed to that computer may be directed properly from its source to its

14             destination.  Most Internet service providers control a range of IP addresses.  Some

15             computers have static-that is, long-term-IP addresses, while other computers have

16             dynamic-that is, frequently changed-IP addresses.

17     f)      Internet: The Internet is a global network of computers and other electronic devices that

18             communicate with each other.  Due to the structure of the Internet, connections between

19             devices on the Internet often cross state and international borders, even when the devices

20             communicating with each other are in the same state.

21     **IV.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

22     22.    Based on my knowledge, training, and experience, I know that electronic devices can

23  store information for long periods of time.  Similarly, things that have been viewed via the Internet are

24  typically stored for some period of time on the device.  This information can sometimes be recovered

25  with forensics tools.

26     23.    Based on my knowledge, training, and experience, I know that wireless phones and

27  electronic devices may be linked, or synched by internet accounts, such that evidence or user

28  information for one device may be found or preserved on another device within the control of that user.

24.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25.     *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence,

because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only materials that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information,

records of session times and durations, internet history, and anti-virus, spyware, and
malware detection programs) can indicate who has used or controlled the computer or
storage media.  This "user attribution" evidence is analogous to the search for "indicia of
occupancy" while executing a search warrant at a residence.  The existence or absence of
anti-virus, spyware, and malware detection programs may indicate whether the computer
was remotely accessed, thus inculpating or exculpating the computer owner.  Further,
computer and storage media activity can indicate how and when the computer or storage
media was accessed or used.  For example, as described herein, computers typically
contains information that log: computer user account session times and durations,
computer activity associated with user accounts, electronic storage media that connected
with the computer, and the IP addresses through which the computer accessed networks
and the internet.  Such information allows investigators to understand the chronological
context of computer or electronic storage media access, use, and events relating to the
crime under investigation.  Additionally, some information stored within a computer or
electronic storage media may provide crucial evidence relating to the physical location of
other evidence and the suspect.  For example, images stored on a computer may both
show a particular location and have geolocation information incorporated into its file
data.  Such file data typically also contains information indicating when the file or image
was created.  The existence of such image files, along with external device connection
logs, may also indicate the presence of additional electronic storage media (e.g., a digital
camera or cellular phone with an incorporated camera).  The geographic and timeline
information described herein may either inculpate or exculpate the computer user.  Last,
information stored within a computer may provide relevant insight into the computer
user's state of mind as it relates to the offense under investigation.  For example,
information within the computer may indicate the owner's motive and intent to commit a
crime (e.g., internet searches indicating criminal planning), or consciousness of guilt
(e.g., running a "wiping" program to destroy evidence on the computer or password
protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how an electronic device works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.   I know that when an individual uses a computer or device to commit the crime of stalking, the individual's computer or device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

27.   *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29.   Because several people use the PREMISES, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## V.        CONCLUSION

30.   I submit that this affidavit supports probable cause for a warrant to search the room controlled by Michael CHAND at the PREMISES, as further described in Attachment A-1, and the person of Michael CHAND, as further described in Attachment A-2, and any cellular or electronic devices found on his person or therein, and seize the items described in Attachment B.

## VI.       REQUEST FOR SEALING

31.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that

online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Christie Hirota

Christie Hirota
Task Force Officer (TFO)
Sacramento Sheriff's Office (SSO)

Sworn to me and signed telephonically
on:                              11/04/2020

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Approved as to form by AUSA AMY S. HITCHCOCK

## ATTACHMENT A-2

The property to be searched is the person of Michael Chand and any cellular or electronic devices found on his person.

Chand is a white male, approximately 5'05" and 230 pounds, with black hair and brown eyes.  Chand's date of birth is September 4, 1991.  His photograph appears below.

The search of Chand shall include Chand's person, clothing, and personal belongings, including backpacks, briefcases, and bags, that are within his immediate vicinity and control at the location where the search warrant is executed within the Eastern District of California and that may contain the items called for by Attachment B to this warrant.  It shall not include a body cavity or strip search.



## ATTACHMENT B

1.　　All records relating to violations of  18 U.S.C. § 2261A, those violations involving Michael Chand, and occurring after January 1, 2020, including:

     a.　Any communications between Michael Chand and CW.

     b.　Any image or video of CW, in any format and whether existing or in cache.

     c.　Any communications that discuss, appear to discuss or relate to CW.

     d.　All downloaded applications and or phone software or data that may have been used to communicate with, discuss, or appear to discuss CW.

     e.　Any information and data regarding Chand's schedule, location or travel.

     f.　All bank records, checks, credit card bills, account information, and other financial records to relate in any fashion to violations or attempted violations of § 2261A.

2.　　Evidence of user attribution showing who used or owned the device(s) or computers at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.　　Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation.

4.　　Evidence indicating the geographic location of the cellular device at times relevant to the investigation.

5.      Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation.

6.      The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

7.      The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the harassment of CW, including records that help reveal their whereabouts.

8.      Computers or storage media used as a means to commit the violations described above, including stalking, in violation of 18 U.S.C. § 2261A.

9.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment.

10.   Routers, modems, and network equipment used to connect computers or devices to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

11.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | Case No.   2:20-sw-1021 KJN |
| The person of Michael Chand and any cellular or ) electronic devices found on his person ) | |
| ) | **SEALED** |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

### SEE ATTACHMENT A-2, attached hereto and incorporated by reference.

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT B, attached hereto and incorporated by reference.

      **YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
      ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   11/04/2020 at 12:00 p.m.
_____

City and state:   Sacramento, California
_____

_____

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
            Signature of Judge                                              Date

## <u>ATTACHMENT A-2</u>

The property to be searched is the person of Michael Chand and any cellular or electronic devices found on his person.

Chand is a white male, approximately 5'05" and 230 pounds, with black hair and brown eyes. Chand's date of birth is September 4, 1991. His photograph appears below.

The search of Chand shall include Chand's person, clothing, and personal belongings, including backpacks, briefcases, and bags, that are within his immediate vicinity and control at the location where the search warrant is executed within the Eastern District of California and that may contain the items called for by Attachment B to this warrant. It shall not include a body cavity or strip search.



## ATTACHMENT B

1.      All records relating to violations of  18 U.S.C. § 2261A, those violations involving Michael Chand, and occurring after January 1, 2020, including:

    a.   Any communications between Michael Chand and CW.

    b.   Any image or video of CW, in any format and whether existing or in cache.

    c.   Any communications that discuss, appear to discuss or relate to CW.

    d.   All downloaded applications and or phone software or data that may have been used to communicate with, discuss, or appear to discuss CW.

    e.   Any information and data regarding Chand's schedule, location or travel.

    f.   All bank records, checks, credit card bills, account information, and other financial records to relate in any fashion to violations or attempted violations of § 2261A.

2.      Evidence of user attribution showing who used or owned the device(s) or computers at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.      Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation.

4.      Evidence indicating the geographic location of the cellular device at times relevant to the investigation.

5.      Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation.

6.      The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

7.      The identity of the person(s) who sent to and/or received communications from the cellular device about matters relating to the harassment of CW, including records that help reveal their whereabouts.

8.      Computers or storage media used as a means to commit the violations described above, including stalking, in violation of 18 U.S.C. § 2261A.

9.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

10.     Routers, modems, and network equipment used to connect computers or devices to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

11.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.